STATE OF NORTH CAROLINA v. FRED ROOSEVELT OXENTINE.

(Filed 24 May, 1967.)

**1. Constitutional Law § 29;  Indictment and Warrant § 2—**

The statutes permitting persons within the classifications enumerated to be excused from jury duty upon application for exemption are constitutional and valid. G.S. 9-19, G.S. 90-45, G.S. 90-150, G.S. 127-84.

**2. Jury § 2—**

Motions to quash the venire or for a special venire from another county are addressed to the sound discretion of the trial court, and the refusal of the motions will not be disturbed in the absence of a showing of abuse of discretion.

**3. Criminal Law § 93—**

Motion to sequester the State's witnesses is addressed to the sound discretion of the trial court, and the refusal of the motion will not be disturbed in the absence of a showing of abuse of discretion.

**4. Homicide § 20—**

The State's evidence tending to show that defendant shot and killed the deceased without justification or provocation, as deceased sat in a chair, *held* sufficient to deny defendant's motions for nonsuit.

**5. Criminal Law § 71—**

The evidence tended to show that while the investigating officer was interrogating a person in the room in which the deceased was lying dead, the officer asked such person who had shot deceased, and she named defendant, whereupon defendant, who was standing at the doorway, stated that he had shot deceased. *Held:* The incriminating statement of the defendant was a voluntary and spontaneous statement made before anyone had been taken into custody and prior to any questioning of defendant, and was competent in evidence.

APPEAL by defendant from *Farthing, J.,* December 1966 Criminal Session, CALDWELL Superior Court.

The defendant was charged in a bill of indictment with murder in the first degree of Edgar J. Wheatley on 15 May 1966. The bill of indictment was returned by the Grand Jury at the August Term, and counsel was appointed to represent him. Upon motion of the defendant, upon his claim that counsel had not had adequate time in which to prepare the case, it was continued and was tried at the December Term. Prior to the trial, his attorney moved to quash the indictment for that the clerk of the superior court had excused from jury service persons who were exempt under the statute and that because of this certain qualified prospective jurors were not used in constituting the Grand Jury which indicted the defendant. The defendant also moved that the State's witnesses be sequestered and further that a special venire of jurors be ordered from another county. Each of the motions was denied.

The solicitor announced that he would not seek a verdict of murder in the first degree, but would seek a verdict of murder in the second degree or manslaughter, as the evidence might justify.

The State offered evidence tending to show that Addie Church went with the deceased, Ed Wheatley, to the house where the defendant Oxentine lived on 15 May 1966. Several other persons were there, and all were drinking beer. Addie Church testified that while they were talking that the defendant left the room and "he came back in the other door and had a .22 rifle in his hands and shot, and I saw blood pouring out of Ed Wheatley. No one had said anything to anybody else in anger. Ed and Eloise had been teasing each other. Ed Wheatley fell over in the floor. Oxentine went out and then came back with the gun . . . Ed was sitting in a chair in the kitchen when the gun was fired. Fred was standing in the door about 15 feet away. Ed was just sitting there." On cross examination, she said, "There were no words said in the house. This man just went in this room and got the gun and shot him down."

Gene Prestwood testified that he was also present. He said that Eloise Coffey came in but didn't sit down. "She stood there for a little while and then left out through the kitchen door. Fred got up and walked to the other room and came back in shooting a .22 rifle. I heard two shots and I saw Ed Wheatley fall over in the floor. I seen a little blood on Ed's chest. Ed was sitting beside me when the shots were fired. He was still in the same chair, and he wasn't arguing with anyone. There was no argument between any of us. Fred was about 7 or 8 feet from Ed when he fired the two shots. Fred then walked back in the front room and unloaded the gun."

L. W. Tripplett, a deputy sheriff, testified that upon his arrival at the scene "Ed Wheatley was dead, laying face down beside the kitchen table . . . I found five beer cans. One can was on the floor, turned over. I touched Ed Wheatley, and I observed a wound on his body, and some blood. When I arrived at the scene, Addie Church was crying, and I asked her what had happened, who had shot him, and she said, 'Fred Oxentine' . . . and Fred was back at the doorway of the other room, and he said, 'Yes, I shot him.' "

At this point the defendant's counsel objected to the statement attributed to the defendant because it was made without the benefit of counsel and that he wasn't warned that anything he said might be used against him. At his request, the jury was excused, and the court heard a statement by the defendant in which he denied saying "Yes, I shot him." He said that Officer Tripplett did not advise him that anything he said could be used against him and that he didn't hear the officer ask Addie Church what happened. The court over-

ruled the defendant's objection, following which the jury returned to the courtroom.

Dr. Paul Moss, the Coroner of Caldwell County, testified that he examined the body of Edgar J. Wheatley, that it "had blood on the front part of his body and there was a small caliber bullet hole in the left chest, just barely above the level of the heart or the level of the border of the heart . . . that Wheatley was dead at the time of his examination and that the cause of his death was a small caliber bullet gunshot wound . . . that death was fairly sudden as the bullet struck some vital organ either the heart or a great blood vessel."

At the conclusion of the State's evidence, the defendant moved for judgment as of nonsuit, which was denied. The defendant offered no evidence and rested and renewed his motion for judgment as of nonsuit, which was also denied.

The jury returned a verdict of Guilty of Manslaughter, and the court ordered the defendant imprisoned for not less than fourteen (14) nor more than eighteen (18) years, from which the defendant appealed.

*Paul L. Beck, Court-Appointed Attorney for the defendant appellant.*

*T. W. Bruton, Attorney General; Millard R. Rich, Jr., Assistant Attorney General, for the State.*

PLESS, J. The defendant's objection to the excusal of jurors by the clerk of superior court was not well founded. The motion itself says that the persons excused were those who made application for exemption and who were entitled to claim such exemption under G.S. 9-19, 90-45, 90-150, and 127-84, and that those excused from service was "pursuant to the North Carolina General Statutes." His claim that the statutes referred to above are unconstitutional is without merit. *State v. Knight,* 269 N.C. 100, 152 S.E. 2d 179.

No other reason is presented for quashing the bill of indictment.

The record contains no evidence or reason upon which the defendant sought to quash the venire, sequester the State's witnesses, or order a special venire from another county.

In his brief, it is said "the defendant is aware that this is within the court's discretion." His view is fully supported by many decisions of our Court, *State v. Strickland,* 229 N.C. 201, 49 S.E. 2d 469; *State v. Godwin,* 216 N.C. 49, 3 S.E. 2d 347, and other cases therein cited. There being nothing in the record to support any

claim that the court abused its discretion, these exceptions are over-ruled.

The State's evidence tended to show that the defendant shot and killed the deceased for no apparent reason as the latter sat in a chair, and there is nothing in the evidence to indicate any provocation on the part of the deceased. It is amply sufficient to deny the motions for nonsuit.

The defendant further excepts to the admission of the evidence of Officer Tripplett that he asked Addie Church what had happened and who had shot the deceased and she said "Fred Oxentine," and that the defendant, standing at the doorway, said "Yes, I shot him." The defendant contends that since he had not been warned of his right to counsel or that anything he said might be used against him that this is in violation of the rule enunciated in *Miranda v. Arizona,* 384 U.S. 436, 16 L. ed. 2d 694. He quotes from that case, "To summarize, we hold that when an individual *is taken into custody* or *otherwise deprived of his freedom* . . . He must be warned *prior to any questioning* that he has the right to remain silent . . ." The underscored phrases exclude the defendant's statement from the conclusions of the *Miranda* case. At the time of the statement the defendant "had not been taken into custody" or "deprived of his freedom" and he was not being questioned within the intent and meaning of the *Miranda* case. It was a voluntary and spontaneous statement made by the defendant, who interposed it while the officer was seeking information about what had happened and was talking with Addie Church. We do not interpret this important decision to exclude statements made at the scene of an investigation when nobody has been arrested, detained, or charged. The exception is without merit and is overruled.

The court-appointed attorney for the defendant interposed every objection available and obtained as favorable a result for the defendant as he could possibly hope for when he was not convicted of murder in the second degree, but on the lesser offense of manslaughter. The defendant never offered reason, excuse or denial of shooting the deceased.

The lawyers of North Carolina have patriotically and generously accepted the burden imposed upon them in undertaking the defense of persons accused of crime when asked to do so by the Court. Few relish these assignments, but all recognize that, as officers of the Court, and members of an honorable profession, it is their duty — and they do it.

In this case, as in all too many others, a reputable attorney accepts, from a sense of duty, the order of the Court that he represent

the defendant. He has no expectation of receiving more than nominal remuneration for his services, and little chance of success for his client. He is required to make technical motions and exceptions which he knows are without merit and frequently to pursue appeals that he knows to be hopeless. He has much to lose. The record is barren of any possible defense in this case, and yet, the attorney is faced with the likelihood that in almost unlimited post-conviction hearings he will shortly be charged by his ungrateful client with dereliction and inefficiency. To him, and to other members of the Bar who render the best possible service under hopeless conditions, the public and this Court owe appreciation and gratitude. It is hereby expressed and extended.

As to the defendant, who for no reason so far shown, has tried, convicted and executed his fellow man without cause, we can only say that he has had what he would not give — a fair trial.

No error.